| | |
|---|---|
| MEGAN HEDGEPETH,<br><br>         Plaintiff,<br><br><br>       vs.<br><br><br>NASH COUNTY, NATALIE WEBB in her individual capacity AND MARY REEVES in her individual capacity.<br><br><br>       Defendants | COMPLAINT FOR DAMAGES<br><br>**(JURY TRIAL DEMANDED)** |

NOW COMES Megan Hedgepeth ("Ms. Hedgepeth," or "Plaintiff"), by and through undersigned counsel of record, and states the following as the Complaint against Mary Reeves ("Ms. Reeves") and Natalie Webb ("Ms. Webb") in their individual capacities.

## Parties

1.     Plaintiff Megan Hedgepeth ("Ms. Hedgepeth") is a citizen and resident of Halifax County, North Carolina.

2.     Nash County, North Carolina is a North Carolina body politic and corporate, created by the General Assembly of North Carolina.

3.     Defendant Mary Reeves ("Ms. Reeves") is an employee and agent of the Nash County Department of Social Services ("NCDSS"). Ms. Reeves is being sued in her individual capacity.

4. Defendant Natalie Webb ("Ms. Webb") is an employee and agent of the NCDSS whose title job title is given as Income Maintenance ("IM") Investigator II. Ms. Webb is being sued in her individual capacity.

## Jurisdiction and Venue

5. Plaintiff brings federal claims under the Civil Rights Act of 1870 (42 U.S.C. §§ 1981 and 1983).

6. Plaintiff brings state law claims under North Carolina common law and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7. All material events giving rise to this cause of action occurred in Nash County, North Carolina and Halifax County, North Carolina. Upon information and belief, all Defendants reside in Nash County, North Carolina or Halifax County, North Carolina. Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Eastern District of North Carolina.

8. Under 28 U.S.C. § 1331, venue is proper in the United States District Court for the Eastern District of North Carolina.

## Background Facts

9. This case stems from the acts of Ms. Reeves and Ms. Webb in their attempt to deprive a minority single mother of the benefits to which she was entitled and, when that attempt failed, their false report to police that Ms. Hedgepeth was committing food stamp fraud, leading directly to her wrongful arrest.

### Ms. Hedgepeth was Wrongfully Accused of Food Stamp Fraud

10. Ms. Hedgepeth was wrongfully and illegally arrested by the Halifax County Police Department, pursuant to a warrant that was issued by the Nash County Police Department (the "Police"). The warrant was issued at the behest of Ms. Natalie Webb

("Ms. Webb") and Ms. Mary Reeves ("Ms. Reeves")—while acting under the color and cloak of state law and authority—for felony food stamp fraud. The arrest of Ms. Hedgepeth was clearly retaliatory and instigated for the purpose of Ms. Webb's and Ms. Reeves' continued harassment of Ms. Hedgepeth. Both Ms. Webb and Ms. Reeves used authority issued to them as employees of Nash County Department of Social Services (the "County DSS") to facilitate the illegal arrest of Ms. Hedgepeth. Furthermore, Ms. Webb and Ms. Reeves targeted Ms. Hedgepeth because she challenged the unconstitutional taking of her benefits absent an opportunity to be heard. These acts represent violations of important constitutional principles.

11.     Ms. Hedgepeth is a single mother of three, one of whom has Downs Syndrome. On May 9, 2018, County DSS informed Ms. Hedgepeth that an anonymous caller reported that the father of her children resided in her home, but had not been accounted for on her request for benefits application. Ms. Hedgepeth directed her landlord to verify her residence with Ms. Webb, and she subsequently produced her lease on May 14, 2018 (the "Lease"). The Lease establishes that Ms. Hedgepeth and her children's father do not reside together. Nonetheless, Ms. Webb requested that Ms. Hedgepeth meet with her on May 18, 2018, and May 31, 2018. During both visits, Ms. Hedgepeth provided proof and witness testimony to establish her address and that her children's father did not reside with her. Ms. Hedgepeth's witnesses identified the "anonymous" reporter by name and explained the malice that was associated with the report. Only then did Ms. Webb "close" the fraud investigation into Ms. Hedgepeth on June 4, 2018.

12.     On June 5, 2018, one day after Ms. Hedgepeth's fraud investigation was "closed", Ms. Webb unilaterally reopened it. Ms. Webb claims that she received a phone

call—from the exact individual who Ms. Hedgepeth's witnesses identified—and this time he identified himself by name and requested information about Ms. Hedgepeth's fraud investigation (which Ms. Webb illegally provided). Ms. Webb indicated that this individual, when asked, verified that Ms. Hedgepeth's children's father resided with Ms. Hedgepeth.

**Defendants Reduce Ms. Hedgepeth's Entitlements Without Due Process**

13. Ms. Webb decided to sit on the investigation and use it to reduce Ms. Hedgepeth's benefits during her recertification period, which began on July 1, 2018. In doing so, Ms. Webb directed that Ms. Hedgepeth's food stamps be drastically reduced to account for the presence of her children's father in her residence, absent hearing or opportunity to be heard.

14. After she ordered the reduction, Ms. Webb began to fish for support to validate her own claim of fraud—and passed her "proof" off as someone else's credible report. On July 5, 2018, Ms. Webb spoke to Ms. Hedgepeth's food-stamp worker and directed her to hold Ms. Hedgepeth's recertification due to the report she received on June 5, 2018. July 6, 2018, Ms. Webb trolled the North Carolina DMV, and found an address that linked Ms. Hedgepeth's children's father to Ms. Hedgepeth. Ms. Webb then called Ms. Hedgepeth's uncle. Based on her own fishing expedition, Ms. Webb officially reopened Ms. Hedgepeth's fraud investigation, effective July 6, 2018. On July 10, 2018, Ms. Webb ordered the reduction of Ms. Hedgepeth's food-stamp benefits without muttering a single word of fraud to Ms. Hedgepeth. Ms. Hedgepeth was not afforded an opportunity to dispute the reduction before it occurred.

15. The secret and closed process that Ms. Webb and Ms. Reeves employed as authorized by the County and State agencies clearly presents the question of whether

these actions comply with fundamental "due process" under the state and federal constitutions, and is substantial. Welfare beneficiaries are entitled to receive more substantive process than was provided to Ms. Hedgepeth. See Goldberg v. Kelly, 397 U.S. 254, 261, 90 S. Ct. 1011, 1017, 25 L. Ed. 2D 287 (1970) ("hold[ing] that due process requires an adequate hearing before termination of welfare benefits, and the fact that there is a later constitutionally fair proceeding does not alter the result").

16.     Ms. Hedgepeth was blindsided by the reduction of her benefits. Ms. Hedgepeth noticed and disputed the reduction of her benefits when the normal amount did not load to her card. Ms. Hedgepeth questioned Ms. Webb and Ms. Reeves about their reduction. Ms. Webb informed Ms. Hedgepeth that she had received new information that warranted a reduction in benefits, and that she (Ms. Hedgepeth) would be able to provide information to show why her benefits should be reinstated afterwards. Ms. Webb did not even identify where this "new" information originated from or what this "new" information consisted of—there simply was no new information. The deprivation was illegal.

### Defendants Were Unable to Provide Any Evidence of Fraud

17.     On July 23, 2018, Ms. Hedgepeth appealed the reduction of her benefits to NC DHHS. Shortly thereafter, Ms. Hedgepeth provided Ms. Webb with a copy of her children's school records. On August 7, 2018, Ms. Hedgepeth followed with a copy of her children's father's car insurance, which unequivocally established that he did not reside with Ms. Hedgepeth.

18.     Ms. Webb and Ms. Reeves still rejected Ms. Hedgepeth's credible documentation. Ms. Webb concluded that the letter from a national insurance company

was fraudulent because it was not derived from the national insurer's corporate office, and instead was printed off the internet.

19. Ms. Webb was so determined to find Ms. Hedgepeth liable for fraud that she sourced and concluded that the envelope and stamp in which Ms. Hedgepeth provided a notarized letter was proof of fraud. In fact, on August 8, 2018, Ms. Webb "decided that the case will more than likely go to court . . . .). *Id.*

20. Ms. Webb wanted to prove her fraud report and to prosecute Ms. Hedgepeth and everyone in the North Carolina database knew of Ms. Webb's actions. Ms. Webb developed her plan and outlined it in the North Carolina database with type-written notes. Ms. Webb said that she would mail out a 10-day reduction-of-benefit letter on August 14, 2018, which will run out on August 28, 2018. Ms. Webb anticipated that Ms. Hedgepeth would probably request a state hearing. After the hearing, and according to Ms. Webb's notes, "warrants will be issued for Megan Hedgepeth". Ms. Webb even anticipated prosecuting Ms. Hedgepeth's family members. No one moved to intersect these wrongful actions.

21. Ms. Webb did not deviate from her malicious plan; she put it into motion. On County DSS letterhead, Ms. Webb sent Ms. Hedgepeth an August 14, 2018 letter, indicating that County DSS had completed its investigation and confirmed that Ms. Hedgepeth had received benefits due to fraud. Ms. Web informed Ms. Hedgepeth that she had until August 28, 2018, to respond.

22. As anticipated, Ms. Hedgepeth disputed Ms. Webb's unconstitutional deprivation and defamatory conclusion. Ms. Hedgepeth received favorable decisions of no finding of fraud in not one, but two NC DHHS hearings that ordered reinstatement of her benefits.

23.     The NC DHHS heard the matter on August 30, 2018. The State Hearing Officer Scott E. Gingery found that County DSS "did not present any information . . . that [Ms. Hedgepeth's children's father] lived in the house . . . ."

24.     On September 5, 2018, NC DHHS issued a decision that required full benefits be reinstated.

25.     Ms. Webb appealed. NC DHHS provided Ms. Webb additional time to get her proof and story together.

26.     On September 27, 2018, NC DHHS State Hearing Officer Linda Eckert issued a Final Decision that categorically said that "County DSS presented no evidence to support their finding that . . . [Ms. Hedgepeth's children's father] resided at the same address . . . ." NC DHHS identified the many pieces of evidence that established separate residences that Ms. Webb chose to ignore. It ordered reinstatement of full benefits. The letter also directed that petition for judicial review was the proper recourse.

**After NC DHHS Ruled In Favor of Ms. Hedgepeth Twice, She Is Wrongfully Arrested for Food Stamp Fraud**

27.     On October 3, 2018, NC DHHS reinstated Ms. Hedgepeth's full benefits. October 4, 2018, one day later, Ms. Webb swore out a warrant for Ms. Hedgepeth's arrest. She noted that Ms. Hedgepeth "obtained and continued to obtain benefits . . . while the father of . . . [her children] is residing in the home and has income." A statement that Ms. Webb knew: 1) had been litigated, and 2) determined to be false by two credible, neutral decision-makers.

28.     Ms. Hedgepeth was arrested at her home, in front of her children, taken to jail and criminally processed. More disturbing is that because the County and State

Departments and their employees failed Ms. Hedgepeth, she was arrested and charged with a felony that she had established twice over that she did not commit.

29.     In the course of the Police's arrest that was instigated by these employees in the scope of their employment, Ms. Hedgepeth was photographed, she was strip searched (very invasive), fingerprinted and treated as if she had engaged in criminal behavior, when Ms. Hedgepeth had already established in two hearings that she did not commit fraud.

30.     In addition to her own distress, now her children have anxiety, are traumatized, and worry that knocks at the door mean that their mother will be arrested and taken away from them.

31.     Pursuant to a discovery request, on October 30, 2018, Ms. Webb produced the same 583 pages of "proof" of fraud as submitted in the administrative hearing. Prosecutor Bill Wolfe dismissed the charge of "Food Stamp Fraud" against Ms. Hedgepeth on April 5, 2019. He, like two NC DHHS hearing officers, found that "[t]here is insufficient evidence to warrant prosecution" and that the "issue was litigated by the Department of Health and Human Services, . . . and DHHS found in favor of Defendant. State has concluded that there is insufficient proof beyond a reasonable doubt that Defendant committed this offense." As three independent persons concluded, there was no evidence of fraud.

32.     Nash County carries liability insurance through its participation in two (2) self-funded risk financing pools administered by the North Carolina Association of County Commissioners (NCACC).

<u>**Damages**</u>

33.     Notwithstanding the dismissal of the criminal action, Ms. Hedgepeth has suffered extensive damages. First, she was arrested and had to post bond. Second, she was charged as a felon, subjected to humiliating strip searches and false imprisonment, and had to pay for adequate legal representation. Third, she is now working to have the wrongful stain permanently removed from her record, which had been pristine beforehand. In addition, Ms. Hedgepeth has damages due to the emotional pain and suffering and reputation that she has sustained. Finally, North Carolina's punitive damages statute is applicable here based on Ms. Webb's and Ms. Reeves' willful and wanton actions leading to the arrest and prosecution of Ms. Hedgepeth, most notably established by the fact that Ms. Hedgepeth had two hearing officers declare that she had not committed fraud, which was information known at the time of prosecution, but that Ms. Webb and Ms. Reeves withheld.

34.     To be clear, Ms. Hedgepeth's damages are in no way minor. Ms. Hedgepeth looked to County DSS to assist her with services. The process backfired against her. Ms. Hedgepeth turned to NC DHHS to end the crusade against her; it did nothing. Her record and charge may be erased, but the existence of his arrest will never be cleared. Moreover, this charge indicates that Ms. Hedgepeth is more than a common criminal. This was a felony that involved allegations of moral turpitude and challenge the quality of Ms. Hedgepeth's character. As indicated above, the evidence of the arrest will remain and can be viewed on the most rudimentary background check. These unwarranted damages will have a foreseeable-lasting impact on Ms. Hedgepeth even beyond what can be ascertained now. In addition, these acts pervert the purpose of the "system." Beneficiaries are not lesser persons who can be mistreated, imprisoned, torn from their children for no reason whatsoever simply because they are poor.

## Allegations

### Count I
### Violation of 42 U.S.C. § 1983
### Against All Defendants

35.    Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

36.    42 U.S.C. § 1983 provides that:

> Ever person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

37.    At all times relevant, Defendants acted under color of law. Without limitation, as acts or omissions constituting disparate treatment, Defendants denied;

a. Her right to be free from unlawful restraint and detention;

b. Her right to be free from unreasonable search and seizure;

c. Her right to be treated fairly;

d. Her right to privacy;

e. Her right to be treated with respect and dignity;

f. Her right to due process.

38.    As alleged throughout this Complaint, Defendants knowingly and intentionally discriminated against Plaintiff based on race, color and sex.

39.    The conduct of Defendants was intentional or in reckless disregard to Plaintiff's rights under § 1983.

40.     As the direct and proximate result of Defendants' violations of § 1983, Plaintiffs have also suffered substantial non-economic damages, including, without limitation, emotional and physical suffering and distress, humiliation and intangible injury from the deprivation of civil rights.

41.     The case was reopened multiple times, Ms. Hedgepeth attempted to seek relief inside the county to no avail, and the only relief she received was when the NCDHHS dismissed Defendants claims against her. After the state dismissed the case against her a second time, Defendants had her arrested. This suggests that Defendants were acting pursuant to a custom or policy of Nash County that was not instep with the policies of the state.

42.     Defendants' discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter them and other similarly situated agents and employees from engaging in this conduct in the future.

## Count II
## 42 U.S.C. §§ 1981, 1983
## Against All Defendants

43.     Plaintiff incorporates and re-alleges all preceding paragraphs as if set forth fully herein.

44.     § 1981 of the Civil Rights Act of 1870, as amended, provides:

> **a.) Statement of Equal Rights:** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**b.) "Make and Enforce Contracts"** defined: For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**c.) Protection against impairment:** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of state law.

45.     Ms. Hedgepeth is a person within the jurisdiction of the United States.

46.     Under § 1981(b), Ms. Hedgepeth is a minority who has the same rights as White citizens as defined by the United States Constitution, including the enjoyment of all benefits, privileges, terms and conditions of White citizens.

47.     42 U.S.C. § 1983 provides:

Ever person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law,

suit in equity, or other appropriate proceeding for redress…

48. Entitlements and benefits are a property interest.

49. At all times relevant, Defendants acted under color of law.

50. In violation of § 1981, Defendants engaged in disparate treatment, denying Ms. Hedgepeth the enjoyment of the benefits, privileges, terms and conditions of her status as a citizen.

51. Without limitation, as acts or omissions constituting disparate treatment, Defendants denied Ms. Hedgepeth:

   a. Her right to be treated as an equal citizen;

   b. Her right to be treated with respect and dignity;

   c. Her right to entitlements and programs for which she was qualified;

   d. The right to be evaluated for entitlements and programs equally;

   e. The right to due process;

   f. Honest, timely and transparent agency investigations;

   g. Equality in the initiation of police charges;

   h. Equality in being free from false arrest and imprisonment;

   i. Equality in not being subject to biased investigations;

   j. Equality in not being subject to unlawful retaliation.

52. Defendants directly discriminated against Ms. Hedgepeth by denying her an opportunity to be heard before a taking or reduction in entitlement benefits and failing to provide a fair and transparent investigation and/or review of her case.

53. As alleged throughout this Complaint, Defendants knowingly and intentionally discriminated against Ms. Hedgepeth based on sex and race.

54. The conduct of Defendants was intentional or in reckless disregard to Ms. Hedgepeth's rights under § 1981.

55. The conduct of Defendants was part of a pattern and practice of discriminatory treatment.

56. As the direct and proximate result of the Defendants' violations of § 1981(b), Ms. Hedgepeth has suffered substantial damages, including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

57. As the direct and proximate result of Defendants' violations of § 1981(b), Ms. Hedgepeth has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation and intangible injury from the deprivation of civil rights.

58. The discriminatory conduct of the Defendants continued despite Ms. Hedgepeth's protestations, the protestations and evidence of witnesses who spoke with investigators, and the findings of two separate hearings before impartial finders of fact that there was no evidence to sustain the allegations against Ms. Hedgepeth.

59. Defendants' discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other governmental agencies from similar misconduct.

### Count III.
### Violation of Fourteenth Amendment Due Process Rights Under 42 U.S.C. § 1983
### Against All Defendants

60. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

61. 42 U.S.C. § 1983 provides that:

Ever person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

62. At all times relevant, Defendants acted under color and cloak of law.

63. Entitlements and benefits are a property interest for due process purposes.

64. Defendants illegally reduced Ms. Hedgepeth's benefits and entitlements without due process of law.

65. Defendants' investigation into the claims against Ms. Hedgepeth and their internal decision making process were not sufficiently open and transparent.

66. Defendants did not issue Plaintiff notice before reducing her benefits.

67. Defendants did not give Plaintiff an opportunity to be heard prior to reducing her benefits.

68. Defendants failed to assess Ms. Hedgepeth fairly before taking her benefits and entitlements.

69. After all of the above failings, and administrative hearing that cleared Ms. Hedgepeth of wrongdoing and an appeal upholding that decision, Defendants swore to criminal charges against Plaintiff, resulting in her arrest, criminal processing and her need to defend herself in a criminal case.

## Count IV
## Violation of Fifth Amendment Due Process Under § 1983
## <u>Against All Defendants</u>

70.     Plaintiff incorporates all preceding paragraphs as if set for fully herein.

71.     At all times, Defendants acted under color and cloak of law.

72.     Defendants failed to provide Plaintiff with due process prior to the reducing her benefits and depriving her of constitutionally guaranteed rights.

73.     Defendants failed to provide notice to Plaintiff prior to reducing her benefits.

74.     Defendants did not give Plaintiff an opportunity to be heard prior to reducing her benefits.

75.     Despite adjudication in Plaintiff's favor at the administrative level, Defendants swore to criminal charges which they knew, or should have known, to be false, resulting in Plaintiff's arrest.


## Count V
## Violation of Fourteenth Amendment Equal Protection Under § 1983
## <u>Against All Defendants</u>

76.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

77.     Defendants denied Plaintiff her right to equal protection under the law.

78.     Upon information and belief, Defendants have serviced other individuals within their capacities as employees of NCDSS and NCDHHS without violating their rights to due process and without making materially false statements/material omissions in a report to the police.

79.     Defendants subjected Plaintiff to disparate treatment under the law because of her race (Black) and sex (female).

## Count VI
## Malicious Prosecution
## <u>Against All Defendants</u>

80.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

81.     Defendants initiated, instituted, procured and participated in an administrative proceeding against Ms. Hedgepeth.

82.     Ms. Hedgepeth's benefits would not have been initially removed, nor would she have had to go through administrative proceedings were it not for the actions of Defendants.

83.     Defendants opened, closed and reopened an investigation into Ms. Hedgepeth for fraud in reference to an anonymous tip that was refuted by numerous witnesses and ample evidence that was shared with Defendants.

84.     After the investigation was reopened, despite no new evidence being presented, Defendants reduced Ms. Hedgepeth's benefits absent an opportunity to be heard.

85.     Ms. Hedgepeth was not given any notice that her benefits were being assessed and only became aware of the reduction when the full amount of aid, in the form of food stamps, failed to load onto her card.

86.     Ms. Webb created memos which she kept in the North Carolina database which outlined her plan to deprive Ms. Hedgepeth of benefits, as well as constitutionally guaranteed rights, through the use of administrative and criminal proceedings.

87.     Defendants brought their investigation before the NCDHHS for an administrative hearing, which took place on August 30, 2018.

88.     Following a decision in Ms. Hedgepeth's favor, Defendants filed an appeal which NCDHHS ruled on September 27, 2018.

89.     Defendants initiated, instituted, procured and participated in a criminal proceeding against Ms. Hedgepeth.

90.     One day after her benefits were restored, Defendant Webb swore to a warrant for Ms. Hedgepeth's arrest for fraudulently obtaining benefits.

91.     Ms. Hedgepeth would not have been arrested but for the Ms. Webb's and Ms. Reeves' reports to police.

92.     Defendants had no probable cause to believe that Ms. Hedgepeth had broken any law, and indeed the matter had been adjudicated multiple times when they initiated the proceedings against Ms. Hedgepeth.

93.     Defendants failed to produce any evidence to the court demonstrating their theory that Mr. Brown was living with Plaintiff at all, let alone rising to the level of probable cause.

94.     It is reasonable to infer that, given the dogged persistence of Defendants in their efforts to punish Plaintiff in the face of uncontroverted evidence that she had committed no wrong, Defendants acted with malice towards Ms. Hedgepeth.

95.     The criminal charges against Ms. Hedgepeth were dismissed, and two previous hearings had already found no evidence to support Defendants' claims that she was defrauding the DSS.


### Count VII
### Abuse of Process
### Against All Defendants

96.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

97.     Defendants knowingly and willingly misused the legal process for their ulterior purpose.

98. Defendants purpose of using the legal process was to deprive a Black woman of her benefits, and later to retaliate against her for the failure of their scheme.

99. Defendants reduced Ms. Hedgepeth's benefits absent an opportunity to be heard in violation of due process.

100. Defendants carried out their investigations and decision making processes with insufficient transparency, allowing their wrongful conduct to go undetected until they removed Ms. Hedgepeth's benefits.

101. Defendants initiated multiple actions against Ms. Hedgepeth, first at the administrative level and then at the criminal level.

102. Plaintiff had her benefits restored following an administrative hearing at which it was determined that Defendants had presented no credible evidence that Plaintiff had violated the requirements for her entitlements and benefits.

103. Despite a lack of evidence of any wrongdoing on the part of Ms. Hedgepeth, Defendants appealed the decision of the administrative body, thus continuing a process which they had put in motion to deprive her of her rights.

104. Given the fact that seven (7) months elapsed between Ms. Hedgepeth's arrest and the dismissal of charges against her, despite two administrative decisions and ample exculpatory evidence in her favor, it is reasonable to infer that Defendants took steps during the criminal process to sustain the action against her and push it forward.

### Count VIII
### Intentional Infliction of Emotional Distress
### Against All Defendants

105. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

106. Defendants conduct towards Ms. Hedgepeth was extreme and outrageous.

107.   Defendants not only harassed Ms. Hedgepeth for months with false allegations that they could not prove at hearings but, when those efforts to strip her of her entitlements failed, turned their attention to holding her criminally liable for a crime she did not commit.

108.   Causing someone to be falsely arrested for a crime that one knows, or ought to know, that person did not commit, is extreme and outrageous behavior.

109.   As a result of her arrest, Ms. Hedgepeth was subjected to an invasive strip search, as well as false imprisonment on account of the false statements and material omissions of Defendants.

110.   The arrest and criminal process caused Ms. Hedgepeth severe emotional distress.

111.   The emotional distress was made all the worse by the fact that Ms. Hedgepeth was arrested in front of her children, including one child with Down Syndrome. This caused extreme distress to the children, as well as to Ms. Hedgepeth who was terrified both for her own well being and for the well being of her children.

112.   Defendants knew, or should have known, that to have someone arrested on false charges is likely to cause extreme emotional distress.

113.   Defendants knew, or should have known, that there was no legitimate reason to arrest Ms. Hedgepeth.

114.   Defendants knew, or should have known, that having someone falsely arrested is likely to lead to severe emotional distress.

115.   It is reasonable to infer that Defendants intended to cause severe emotional distress to Plaintiff.

## Count IX
## Negligent Infliction of Emotional Distress
## Against All Defendants

116. Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

117. In addition and in the alternative to Plaintiff's claim of intentional infliction of emotional distress, Defendants acted negligently, bringing about Plaintiff's emotional distress.

118. Defendants acted negligently by depriving Ms. Hedgepeth of her benefits without due process.

119. Defendants acted negligently by re-opening the case multiple times on what they should have realized was unsupported, biased and/or otherwise inaccurate information.

120. Ultimately, after the matter was adjudicated and discharged in Plaintiff's favor, Defendants presented incomplete information to police, causing Ms. Hedgepeth to be arrested in front of her children

121. Being arrested on false charges in front of her children caused both Ms. Hedgepeth and her children extreme emotional distress.

122. The criminal process, including an invasive strip search, arraignment and other proceedings, caused Ms. Hedgepeth severe emotional distress.

123. It was reasonably foreseeable that to have a person arrested on false charges would cause severe emotional distress.

124. It was reasonably foreseeable that to pursue an action against a person for months that threatens their financial stability with no evidence, to impugn that person to their community and to continue the action even after it was adjudicated in that person's favor, would cause severe emotional distress.

## Prayer For Relief

WHEREFORE, Plaintiff demands that judgment be entered on her behalf against Defendants and the following relief granted.

a. An award of compensatory damages for Plaintiff in an amount to be determined by the enlightened conscience of the trier of fact, jointly and severally, against Defendants;

b. An award of pre-judgment and post-judgment interest;

c. An award of costs, including, but not limited to, discretionary costs;

d. Attorneys' fees and expenses incurred in pursuing this case under 42 U.S.C. § 1988;

e. Any other and further relief that this Court deems just and proper; and

f. Any other and further relief to which Plaintiff may be entitled.

Plaintiff makes the following requests regarding punitive damages:

a. Punitive damages which are sufficient to punish each Defendant and deter others from like misconduct

b. For the costs of suit; and

c. Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand trial by jury in open court on all Counts. Respectfully submitted this 1st day of October, 2021.

PLAINTIFF,

MEGAN HEDGEPETH


By her Attorney:


/s/Sharika M. Robinson



SHARIKA M. ROBINSON,
North Carolina Bar No.: 44750
THE LAW OFFICES OF SHARIKA M ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax:    (704) 561-6773
srobinson@sharikamrobinsonlaw.com
*Counsel for Plaintiff*